IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JEROME THOMAS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:09-cv-402 |
| | ) | |
| SAMUEL ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment [DE 47] filed by the defendant, Samuel Roberts, on June 30, 2014, and the Motion to Strike [DE 51] filed by Roberts on August 15, 2014. For the following reasons, the Motion for Summary Judgment [DE 47] is **DENIED,** and the Motion to Strike [DE 51] is **DENIED AS MOOT**.

*Background*

On the afternoon of September 22, 2009, the defendant, Lieutenant Samuel Roberts, a supervisor in the Patrol Division for the City of Gary Police Department, was on patrol in a marked police car. Roberts received a dispatch regarding a report of abandoned guns near 34th and Maryland Streets in the Glen Park section of Gary, Indiana. Roberts headed toward the location of the abandoned guns, but he was diverted when he heard over the police radio that the guns had been recovered. He then received another dispatch regarding a burglary in the 3400 block of Virginia Street.

Upon arriving at the burglary call, Roberts spoke with a resident, LuAnn Weldon. She stated that she saw someone crawl out of her window and run west towards Maryland Street.

1

She described the intruder during her call to the police as a black male with a small Afro, wearing a red shirt and dark pants. She stated that he was approximately 5'9"-6'0" and weighed 200-240 pounds. Roberts did not recall whether Weldon provided him with this description at the scene of the burglary or whether the other officers described the suspect to him. However, the offense report described the suspect consistent with Weldon's description. Roberts received a call that the burglary may have been related to the gun incident and left to go look for the suspect.

While traveling west on 35th Avenue, Roberts received a call on his cell phone from his girlfriend, Candi Manning. She lived in the area near where the abandoned guns had been discovered. Manning's neighbor, Willie Woods, told her that he observed one man wearing a red shirt walk past his house and put down the guns. Manning shared this description and told Roberts that she observed two men going back to the area where the abandoned guns had been discarded. Manning told Roberts that the individuals she saw were heading south on Maryland Street and if he hurried, he could catch them. She described one of the individuals as an African American wearing blue or blue jean shorts and carrying a bag. At her deposition, Manning stated that she knew one of the males was wearing a white t-shirt but that she could not recall the color of the other male's t-shirt.

Roberts spotted two males when he was approaching 35th and Maryland Streets who believed fit the description provided by Manning and reported over the police dispatch. One of the males was wearing blue shorts and was the plaintiff, Jerome Thomas. At the time, he was wearing blue basketball shorts and a white t-shirt. He was 6 feet 2 inches tall and weighed approximately 150 pounds. The other individual was Keith Thomas who was 5'9" tall, weighed

2

140 pounds, and was wearing basketball shorts and a black t-shirt. Both of the males were teenagers. Neither was armed, and Roberts had not observed either with a weapon.

Roberts followed the two males in his marked police car. They continued to walk away from the car until Roberts instructed them to stop, at which time they complied. At all times, the suspects followed Roberts' commands and did not display any aggressive conduct. Roberts did not call dispatch for backup, nor did he call the officers who were one block away investigating the burglary.

Because Roberts believed that one of the males fit the description of the suspect who committed the burglary and abandoned the guns, he took out his gun as he approached the males, approximately one block from where the teens were crossing the street. Roberts removed the gun from his holster on the right side of his waist using his dominant right hand. He placed the gun between his legs as he drove and picked it up with his left, non-dominant hand after he approached the teens and put his car in park. Roberts testified that he picked the gun up with his left hand so that if a battle started his left arm would not have been in the way of his right. With the gun in his left hand, Roberts opened the car door. Jerome testified that Roberts' gun was in his right hand the entire time.

Roberts stated that when he put the gun in his left hand, he put his finger on the trigger instead of the barrel. Roberts had been trained to keep his finger outside of the trigger guard until he was ready to shoot. When asked why his finger was on the trigger at this point, Roberts testified that he did not know.

During the course of exiting the vehicle, the gun discharged. Roberts did not remember at what point the gun discharged, except that he was stepping out of the car and had not made it entirely out of the car at the time it went off. He also testified that he did not know if the gun

3

was on the left or right side of the car door when it discharged, but he concluded that because the bullet did not go through the window, his arm and gun were on the outside of the car door when it discharged. Roberts stated that he did not know why he pulled the trigger. A witness, Lorraine Scott, reported that Roberts was completely out of his car and standing at the time the gun discharged. Immediately after the discharged, Roberts said "Oh, shit."

The bullet hit Jerome in the right forearm, shattering it, and continued through his arm into his right kidney. Jerome lost his kidney as a result. Jerome asked Roberts why he shot him, to which Roberts replied, "dude, I didn't mean to shoot you." Roberts called for immediate medical attention. Jerome was arrested for the burglary, but he never was charged for either the burglary or any crime related to the abandoned guns. He also was arrested for minor in possession of alcohol and eventually pleaded guilty to neglect of a dependent because he left his 3-year-old nephew at home.

Prior to the shooting, Roberts had received gun training. As an early teen, he received firearm training with a rifle. From 1986-1990, he received additional training as a United States Marine. He became a Gary Police Officer in 1992, and received most of his training while employed by the Gary Police Department. On October 24, 2003, Roberts took 6 hours of gun safety and weapon training. On November 9-10, 2005, he took 12 hours of handgun/rifle/firearms training and an additional 4 hours of night shooting and rifle training. He took several more hours of firearm training in 2007 and 2008. Roberts also was required to qualify with his weapons once every year. His firearm examinations and qualification results from 2000, 2003, and 2006-2008, show that he was proficient with a handgun with both hands while standing, kneeling, and barricaded.

Jerome filed a complaint against Roberts in his individual capacity only on December 3, 2009, alleging that Roberts violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution by applying excessive force and stopping, seizing, and shooting him without probable cause. Roberts now moves for summary judgment, arguing that the shooting was not intentional.

*Discussion*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." **Celotex Corp. v. Catrett**, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); **Garofalo v. Village of Hazel Crest**, 754 F3d 428, 430 (7th Cir. 2014); **Kidwell v. Eisenhauer,** 679 F.3d 957, 964 (7th Cir. 2012); **Stephens v. Erickson**, 569 F.3d 779, 786 (7th Cir. 2009). A fact is material if it is outcome determinative under applicable law. The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. **Adickes v. S.H. Kress & Company**, 398 U.S. 144, 160, 90 S. Ct. 1598, 1610, 26 L. Ed.2d 142, 155 (1970); **Stephens**, 569 F.3d at 786. If the non-movant bears the ultimate burden of persuasion on an issue at trial, the requirements are not as onerous for the moving party. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Under this circumstance, the moving party can either come forward with affirmative evidence negating an element of the opponent's claim or by asserting that the nonmoving party has insufficient evidence to succeed on its claim. **Modrowski**, 712 F.3d at 1169.

Summary judgment may be entered against the non-moving party if it is unable to "establish the existence of an essential element to [the party's] case, and on which [that party] will bear the burden of proof at trial . . .". ***Kidwell***, 679 F.3d at 964 (citing ***Benuzzi v. Bd. of Educ.***, 647 F.3d 652, 662 (7th Cir. 2011) (quoting ***Celotex***, 477 U.S. at 322, 106 S.Ct. at 91). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." ***Blythe Holdings, Inc. v. DeAgnelis***, 750 F.3d 653, 656 (7th Cir. 2014)(quoting ***Anderson v. Liberty Lobby***, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The non-moving party must show specific facts that create a genuine issue for trial. ***Blythe***, 750 F.3d at 656.

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial. ***Anderson v. Liberty Lobby, Inc***., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); ***Cung Hnin v. Toa, LLC***, 751 F.3d 499, 504 (7th Cir. 2014); ***Stephens***, 569 F.3d at 786; ***Wheeler v. Lawson***, 539 F.3d 629, 634 (7th Cir. 2008).

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.

***Anderson v. Liberty Lobby, Inc***., 477 U.S. at 250, 106 S. Ct. at 2511.

*See also* ***Reeves v. Sanderson Plumbing Prods., Inc***., 530 U.S. 133, 149-51, 120 S.Ct. 2097, 2109, 147 L. Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); ***Celotex***

*Corp*., 477 U.S. at 322-23, 106 S. Ct. at 2553; *Stephens*, 569 F.3d at 786; *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)(stating that a genuine issue is one on which a reasonable fact finder could find for the nonmoving party); *Springer v. Durflinger,* 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Blythe*, 750 F.3d at 656 (quoting *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Title 42 U.S.C. § 1983 provides a "federal cause of action for the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States . . . ." *Livadas v. Bradshaw*, 512 U.S. 107, 132, 114 S.Ct. 2068, 2082, 129 L.Ed.2d 93 (1994). Section 1983 does not itself create substantive rights, but "it acts as an instrument for vindicating federal rights conferred elsewhere." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997). When analyzing a § 1983 claim, it is necessary to identify the specific constitutional right that was violated. *Spiegel*, 121 F.3d at 254. Then, the validity of the claim must be judged by reference to the specific constitutional standard that governs the right. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989).

Jerome alleges that Roberts violated his Fourth Amendment right by applying excessive force. The use of force during the course of an arrest, investigatory stop, or other seizure of a citizen is analyzed under the Fourth Amendment reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("all claims that law enforcement officers used excessive force-deadly or not-in the course of an arrest, investigatory

stop, or other seizure of a free citizen should be analyzed under the Fourth Amended and its reasonableness standard."); *Holmes v. Village of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). This analysis looks to the totality of the circumstances, assessing whether the force used was excessive in light of the severity of the plaintiff's actions, whether the plaintiff posed a threat to the safety of the officers or to other persons, and whether the plaintiff was resisting the officers or attempting to flee. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872; *Holmes*, 511 F.3d at 673. *See also Miller v. Gonzalez*, ---F.3d---, 2014 WL 3824318, *6 (7th Cir. Aug. 5, 2014); *Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 862 (S.D.Ind. 2006). The measure of reasonableness is made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The court must ask whether the officer "used greater force than was necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003). In determining reasonableness, the court must account for the fact that police officers often have to make split-second decisions in tense situations. For this reason, not every push or shove violates the Fourth Amendment. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872.

The limits of the Fourth Amendment extend to the intentional conduct of state actors. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed. 2d 628 (1989)("In sum, the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct.")(citations and quotations omitted); *Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990); *Frye v. Town of Akron*, 759 F.Supp. 1320, 1323 (N.D. Ind. 1991). In *Brower,* the Supreme Court expressly referred to the implication of the Fourth Amendment arising from a "governmental termination of freedom of movement through means

intentionally applied." *Brower*, 489 U.S. at 597, 109 S.Ct. at 1381. An accident or negligence cannot form the basis of a Fourth Amendment constitutional violation. *Brower*, 489 U.S. at 596, 109 S.Ct. at 1381. *See e.g*. *Glasco v. Ballard*, 768 F.Supp. 176, 180 (E.D. Va. 1991)("[A] more appropriate understanding of the case law, as well as the history of the Fourth Amendment, suggests that a wholly accidental shooting is not a 'seizure' within the meaning of the Fourth Amendment.").

The parties dispute whether Roberts intentionally fired his gun. It is Roberts' position that none of the evidence contradicts his testimony that he fired the gun by accident. Roberts also points to the fact that he said "oh, shit" immediately after the gun went off. However, the court does not find that Roberts' testimony is conclusive of his intent. This would require the court to accept Roberts' testimony as true and to make a credibility determination. This is a duty reserved for the jury. Rather, as Jerome argues, the circumstances must be considered in their entirety.

In support of his argument, Roberts first refers the court to *Greene v. City of Hammond*, 2007 WL 3333367 (N.D. Ind. Nov. 6, 2007). In *Greene*, several Hammond police officers entered the plaintiff's house to execute a search warrant. The plaintiff was not compliant, and the officers had to struggle to restrain him. The defendant police officer brought his weapon out to cover the officer who was cuffing Greene and testified that the gun discharged accidentally. He could not recall whether his finger was on the gun's trigger when it discharged or whether it caught on his gear. He immediately yelled "oh shit" after the shot went off. In response to the defendant's motion for summary judgment, the court noted that the plaintiff "makes little more than passing reference to Betustak's intentional use of his weapon" and "bases his arguments on the belief that 'whether it was accidental or not is of no consequence in an excessive force

9

case.'" *Greene*, 2007 WL 3333367 at *5. The court further acknowledged that Greene's compliance with the officers' orders and the fact that he was not armed and did not pose a threat were not relevant to the officer's state of mind, but that the dispute might have been relevant to a claim that the officer was negligent in keeping his gun unholstered despite the plaintiff's compliance.

Jerome has not overlooked the relevance of Roberts' intent. Although Jerome similarly refers to his compliance with Roberts' commands, and as *Greene* explained this is not relevant to the officer's intent, he also relies heavily on Roberts' actions leading up to the incident as indicative of his intent. Roberts believed the teens to be armed, feared for his life, took out his gun in anticipation of an encounter, pointed his gun at the teens, put his finger on the trigger, and exerted 5.5 pounds of pressure. *See* ***Santibanes v. City of Tomball, Texas***, 654 F.Supp.2d 593, 605 (S.D. Tex. 2009) (considering the officer's actions leading up to shooting as indicators of his intent). He did all this despite his training not to place his finger on the trigger until he was on target and ready to shoot.

Roberts did not testify that he was unaware of whether he had his finger on the trigger or that the gun may have gone off for some reason other than by him pulling the trigger, such as by it getting caught on his gear as did the officer in *Greene*. Rather, Roberts admitted that his actions leading up to the shooting were calculated and that he placed his finger on the trigger despite having received training not to do so until he was ready to shoot. Although he stated that he did not know why he either placed his finger on or pulled the trigger, it is not the function of the court to draw the conclusion that it must have been an accident. The fact that Roberts does not know why he pulled the trigger leaves open the question of his intent.

Roberts places emphasis on the fact that he yelled "oh shit" following the gun's discharge and also refers the court to his expert's opinion that officers are trained to shoot in two rounds. Again, neither of these facts is conclusive of what Roberts was thinking at the moment the gun discharged. Roberts' training did not guide his actions on this date, as he also testified that he placed his finger on the trigger despite being trained otherwise. And, saying "oh shit" does not necessarily reflect that the firing was an accident. Perhaps he did not hit where he aimed or said it because he realized it was the incorrect thing to do in the situation. There are a myriad of possible explanations, but again, that is not for the court to determine.

At this stage, there is sufficient evidence to show that Roberts' actions may have been intentional. If testimony to the contrary always was conclusive of intent, a plaintiff never would succeed. Rather, the circumstances in their totality, particularly those concerning Roberts' deliberate actions leading up to the discharge and the fact that he admitted that his finger pulled the trigger, leave open the possibility that he intended to fire the shot. The jury is the appropriate medium to determine whether Roberts accidently could have applied 5.5 pounds of pressure to the trigger. The court is unwilling to make the leap from Roberts' testimony that he did not know why he fired the shot to the conclusion that it must have been an accident. His testimony itself is inconclusive of his intent, unlike the officer's in *Greene*. This is the type of factual dispute that is best reserved for the jury.

Roberts also moves to strike certain facts and exhibits that Jerome included in his response to the motion for summary judgment. Because the court did not rely on these statements or exhibits, and instead decided the motion on the absence of conclusive evidence eliminating a genuine issue of material fact, the court **DENIES AS MOOT** the Motion to Strike.

Based on the foregoing reason, the Motion for Summary Judgment [DE 47] is **DENIED**, and the Motion to Strike [DE 51] is **DENIED AS MOOT**.

ENTERED this 3rd day of October, 2014

/s/ Andrew P. Rodovich
United States Magistrate Judge